UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-14420-CIV-ROSENBERG/MAYNARD

ATLANTIC HEALTHCARE, LLC, et. al.,

    Plaintiffs,

v.

ARGONAUT INSURANCE COMPANY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DE 27) AND DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT (DE 57)

At issue is the Directors & Officers Liability ("D&O") insurance policy that the Plaintiffs, Timothy F. Nicholson, Atlantic Healthcare, LLC ("Atlantic Healthcare"), Lyric Health Care Facilities, LLC ("Lyric Health Care"), and Gratham Health Care, LLC ("Gratham Health Care") (collectively "Plaintiffs") bought from their insurer, Argonaut Insurance Company (hereafter "Argonaut" or "Defendant").  Plaintiffs invoked the insurance policy's protection after the estate of Ms. Lily Coombs, a patient at Atlantic Healthcare Center Nursing Home (the "Facility"), sued Plaintiffs in Florida state court for breach of duties owed to Ms. Coombs while she resided at the Facility.  Argonaut denied Plaintiffs' request, answering that the estate's claims fall outside the scope of the coverage provided by the D&O policy.  Plaintiffs disagreed and filed a third-party complaint against Argonaut in the Coombs lawsuit seeking a declaratory judgment that Argonaut has a duty to defend them under the D&O policy. *See* DE 1.  On October 16, 2019, the state trial court severed the third-party complaint from the Coombs lawsuit, and shortly thereafter Argonaut removed the matter to this Court pursuant to 28 U.S.C. § 1332.  *Id.*  Both parties have now moved

for summary judgment[1] on the issue of whether Argonaut has a duty to defend Plaintiffs in the state court litigation asserted against them by the Coombs estate.

This Court has considered all relevant filings, the evidence of record, and the arguments heard on July 30, 2020.  Having done so, the undersigned recommends that Plaintiffs' Motion for Summary Judgment be GRANTED, and Defendant's Cross-Motion for Summary Judgment be DENIED.

## **MATERIAL FACTS**

The underlying civil case (the "Coombs Lawsuit") was filed by the estate of Ms. Lily Coombs on July 20, 2018 in the Nineteenth Judicial Circuit Court in and for Indian River County, Florida.  The amended complaint in that action ("Underlying Complaint") is found at DE 57-1.  According to the Underlying Complaint, Ms. Coombs was a patient and resident at the Facility from January 9, 2012, until her death on December 5, 2016.  DE 57-1 at ¶ 2.  The Underlying Complaint accuses Plaintiffs and others of causing physical and monetary injuries to Ms. Coombs through a complex corporate scheme that breached fiduciary and statutory duties owed to her.  *See generally id.*   It alleges that during the relevant time period the Facility was owned 100% by Atlantic Healthcare.  *Id.* at ¶ 5.  Atlantic Healthcare, in turn, was owned 100% by Lyric Health Care, which itself was owned 100% by Gratham Health Care (together, "the Nicholson companies").  *Id.* at ¶¶ 9, 13.  Gratham Health Care was owned 100% by Timothy F. Nicholson ("Nicholson").  *Id.* at ¶ 16.  The Coombs estate alleges that Nicholson did not treat the Nicholson companies as entities separate from himself and commingled his personal funds with the

---

[1] Before the Court is Plaintiffs' Motion for Summary Judgment, DE 27, and Defendant's Amended Motion for Summary Judgment, DE 57.  A month after filing its original Motion for Summary Judgment, Defendant moved the Court for leave to file an amended Motion in part because Defendant failed to file its Statement of Material Facts with the original Motion.  *See* DE 55.  The Court granted Defendant leave to file an Amended Motion for Summary Judgment, denying the original motion on purely procedural grounds.  *See* DE 56.  Thus, the Court presently considers Plaintiffs' Motion and Defendant's Amended Motion for Summary Judgment.

companies' assets. *Id.* at ¶ 17-18.   None of the Nicholson companies had offices, employees, corporate books or records, boards of directors, annual meetings or any other corporate formalities. *Id.* Instead, the Nicholson companies were created for three "improper and fraudulent purpose(s)": (1) to shield Nicholson from liability for his control and operation of the Facility; (2) to conceal Nicholson's ownership of the Facility from regulatory authorities; and (3) to enable Nicholson to contract with other companies he had an ownership interest in to maximize profits for himself and his co-conspirators. *Id.* at ¶ 19.

The Coombs estate also sued several other companies in addition to the named Plaintiffs. *See generally id.*   These include Addit LLC; Milestone Retirement Communities, LLC; SLC Professionals Chai, LLC; SLC Professionals Monarch ("Monarch"); and SLC Professionals Holdings, LLC (together, "the joint venture companies"). *See id.* at ¶ 56.  The joint venture companies were owned and managed in varying degrees and combinations by Brian Reynolds, John W. Dwyer, and Alan Zuccari. *Id.* at ¶¶ 20-39, 47, 50, 53.  Reynolds, Dwyer, Zuccari and Nicholson also jointly owned Lyric Healthcare Holdings, III, Inc. ("Lyric Holdings"), of which Nicholson was the majority owner. *Id.* at ¶ 60.

In 2012, Nicholson, Reynolds, Dwyer, and Zuccari orally agreed to operate Lyric Holdings and the joint venture companies together as a joint venture ("Venture"). *Id.* at ¶¶ 56-60.   The purpose of the Venture, which operated under the trade name Compass Pointe Healthcare Systems, was to manage nursing homes throughout the country. *Id.* at ¶¶ 56-57.   Nicholson, Reynolds, Dwyer, and Zuccari each had authority to vote on Venture decisions. *Id.* at ¶ 58.  Each owned a percentage of the Venture and was entitled to profits and subject to losses in proportion to their respective ownership interests. *Id.* at ¶¶ 59, 61. Paragraph 62 of the Underlying Complaint alleges that the Venture consisted of independent companies "on paper" in order to create the illusion of

"ring-fencing." *Id.* at ¶ 62.  In fact, however, the companies acted jointly in complete disregard of their independent "ring-fencing" structures. *Id.*  Proceeds from the Venture were used to satisfy cash needs of any of the joint venture companies regardless of their so-called separate corporate structures. *Id.* at ¶ 63.  The Coombs Lawsuit complains generally that Nicholson, through the Nicholson companies, entered into contracts with the Venture to operate the Facility in a manner that would "generate as much profits as possible" at the expense of the residents, including Ms. Coombs. *Id.* at ¶ 65.

The Coombs Lawsuit makes several specific complaints.  First, it complains that Nicholson concealed his indirect 100% ownership interest in the Facility "to avoid scrutiny from the Agency for Health Care Administration ('AHCA') into the various agreements" between the Facility, the Venture, and the joint venture companies. *Id.* at ¶ 66.  In 2012, the Facility contracted with Monarch to manage the Facility in exchange for a fixed percentage of the Facility's revenues. *Id.* at ¶ 67.  The agreed upon fixed percentage was above market rates. *Id.*  The Underlying Complaint alleges that AHCA would have investigated the contract if it knew about Nicholson's ownership interests in both the Facility and the Venture. *Id.* at ¶ 68.  To prevent this scrutiny, Nicholson and the Venture concealed Nicholson's indirect 100% ownership interest in the Facility on the Facility's license renewal application filed with AHCA on May 25, 2012. *Id.* at ¶ 69.  Nicholson and the Venture also concealed Nicholson's ownership interests in the Facility and in Monarch on the license renewal application filed with AHCA on May 23, 2014. *Id.* at ¶¶ 70-71.

Next, the lawsuit contends that Nicholson and others operated the Facility with inadequate nursing staff. *Id.* at ¶ 74.  The Underlying Complaint points to Rule 59A-4.108 of the Florida Administrative Code, which provides that a nursing home "must have sufficient nursing staff, on a 24-hour basis to provide nursing and related services to residents" to maintain the highest well-

being of residents.  *Id.* at ¶¶ 75-76.  The estate alleges that Nicholson and the Venture intentionally operated and managed the Facility with insufficient nursing staff on a daily basis in order to maximize profits.  *Id.* at ¶¶ 74-77.

Third, the lawsuit contends that Nicholson and others targeted higher acuity[2] level patients with marketing and recruitment efforts and admitted these patients to the Facility without providing the increased staffing necessary to meet their healthcare needs.  *Id.* at ¶¶ 78-82.  They did this because Medicare pays more for patients with complicated medical needs.  *Id.*  Instead of using payments for patient care, however, Nicholson and the others diverted the funds through "fund transfers, management fees, therapy services and rate payments" between the joint venture companies billed at higher than market rates.  *Id.* at ¶¶ 89-90.  Nicholson and his co-conspirators "actively and knowingly participated in such conduct" and "condoned, ratified or consented to such conduct."  *Id.* at ¶ 93.

Fourth, the lawsuit alleges that the Facility breached various fiduciary duties to Ms. Coombs, who was unable to care for herself independently.  *See id.* at ¶¶ 94-112.  The Facility accepted monies intended to provide for her care, represented that it would provide the full value of that care, and failed to do so.  *Id.* at ¶¶ 102, 105.  The Facility breached duties of loyalty, good faith and fair dealing.  *Id.* at ¶ 106.   It did so by (1) using residents' assets and payments for "inflated, unreasonable and improper inter-company fees and transfers" instead of for patient care; (2) understaffing the Facility to increase profits; and (3) entering numerous contracts that benefitted Nicholson and the others and harmed the residents.  *Id.* at ¶ 107.  Ms. Coombs and other

---

[2] Per the Underlying Complaint, acuity refers to how sick a patient is and what level of care he or she requires.  DE 57-1 at ¶ 79.  A resident with complex medical needs requires a higher level of care and is therefore considered a higher acuity nursing home resident.  *Id.*

residents suffered physical and monetary damage as a result, while Nicholson and the others were unjustly enriched. *Id.* at ¶¶ 90, 109-10.

Lastly, the lawsuit alleges the conduct of Nicholson and the others constitutes exploitation of a vulnerable adult in violation of Florida law. *Id.* at ¶ 130. Ms. Coombs was a vulnerable adult with a long-term disability, unable to perform the normal activities of daily living or provide for her own care or protection. *Id.* at ¶ 129. Nicholson, his companies, and their co-conspirators received compensation from Ms. Coombs's personal assets, including her Medicare and Medicaid benefits, to provide for her support and maintenance but failed to effectively do so. *Id.* at ¶¶ 131-35. Thus, the lawsuit alleges, they obtained and used the assets of a vulnerable adult without her consent with the intent of depriving her of those assets. *Id.*

The Underlying Complaint asserts four causes of action against Nicholson, the Nicholson companies, and the other Venture participants. *See id.* at ¶¶ 113-44. Count I alleges a claim for aiding and abetting breach of fiduciary duties. Count II alleges a claim for civil conspiracy to breach fiduciary duties. Count III alleges violations of Florida Statute § 415.1111, which relates to exploitation of vulnerable adults.[3] Count IV alleges a claim for civil conspiracy for violations of Florida Statute § 415.1111. The Underlying Complaint seeks "damages, restitution, disgorgement of profits and any consequential damages" for all counts. *Id.* at 27, 29-30, 31-32, 34. It adds requests for attorneys' fees and costs for Counts III and IV, and prejudgment interest for Count IV. *Id.*

---

[3] Florida Statute § 415.1111 provides, in relevant part:

> A vulnerable adult who has been abused, neglected, or exploited as specified in this chapter has a cause of action against any perpetrator and may recover actual and punitive damages for such abuse, neglect, or exploitation. The action may be brought by the vulnerable adult, . . . or by the personal representative of the estate of a deceased victim without regard to whether the cause of death resulted from the abuse, neglect, or exploitation.

§ 415.1111, Fla. Stat. (2006).

## STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indiana of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008). A dispute is material "if it would affect the outcome of the suit under the governing law[.]". *Id.* When deciding a summary judgment motion, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016). The Court does not weigh conflicting evidence. *Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quotation omitted).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion." *Torres v. Rock & River Food Inc.*, 244 F. Supp. 3d 1320, 1327–28 (S.D. Fla. 2016) (citations omitted). Cross-motions for summary judgment do not in themselves warrant a grant of summary judgment unless one party is entitled to judgment as a matter of law based on facts that are not in dispute. *Id.* Each motion must be considered on its own merits, and all reasonable inferences must be drawn against the party whose motion is under consideration. *Id.*

## DISCUSSION

### A. Choice of Law

Florida applies the rule of *lex loci contractus* to determine which state's laws are applicable to an issue of rights or liabilities under an insurance contract. *See State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006). That rule provides that "the law of the jurisdiction

where the contract was executed governs the rights and liabilities of the parties in determining an issue of insurance coverage." *Id.* (citing *Sturiano v. Brooks,* 523 So.2d 1126, 1129 (Fla. 1988)). "The determination of where a contract was executed . . . requires a determination of where the last act necessary to complete the contract was done." *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1092–93 (11th Cir. 2004). The parties agree the last act in this case was done in Maryland as the Policyholder is a Maryland company, and the Insurance Contract was delivered to the Policyholder at a Maryland address. *See* DE 27 at 6; DE 57 at 3-4. *See also Sparta Ins. Co. v. Colareta*, 990 F. Supp. 2d 1357, 1362 (S.D. Fla. 2014) ("In a case involving an insurance policy, the place where the contract was executed is generally considered to be the place where the policy is delivered." (internal quotation omitted)); *Liberty Mut. Ins. Co. v. Festival Fun Parks, LLC*, No. 12-cv-62212-RSR, 2013 WL 4496511, at *2 (S.D. Fla. Aug. 22, 2013) (applying California law because the insured "is a California corporation with its principal place of business in California, and the policy at issue in this case was delivered to a mailing address for [the insured] located in California."). Therefore, Maryland law governs the Court's determination of rights and liabilities under the Policy.

### B.     Maryland Law on Interpreting Insurance Policies

Under Maryland law, the interpretation of an insurance policy is governed by the same principles applicable to the construction of other contracts. *Mitchell v. AARP*, 779 A.2d 1061, 1069 (Md. Ct. Spec. App. 2001). The primary principle of construction in deciding the issue of coverage under an insurance policy is to apply the terms of the insurance contract itself. *Universal Underwriters Ins. Co. v. Lowe ("Lowe"),* 761 A.2d 997, 1005 (Md. Ct. Spec. App. 2000). Thus, judicial interpretation of insurance contracts begins with the language employed by the parties, *MAMSI Life & Health Ins. Co. v. Callaway ("Callaway")*, 825 A.2d 995, 1005 (Md. 2003), and

"words of an insurance policy are to be given their ordinary meaning." *Warfield–Dorsey Co., Inc. v. Travelers Cas. & Sur. Co. of Illinois*, 66 F. Supp. 2d 681, 685 (D. Md. 1999). Courts are to analyze the plain language of the insurance contract according to the words and phrases in their ordinary and accepted meanings as a reasonably prudent layperson would understand them to mean. *Lowe*, 761 A.2d at 1005 (alteration in original). However, when a policy defines a term in a manner different from the term's ordinary understanding, the policy definition controls. *Valliere v. Allstate Insurance Co.*, 596 A.2d 636, 638 (Md. 1991).

It is the court's responsibility to interpret the insurance policy and decide whether there is coverage. *Lloyd E. Mitchell, Inc. v. Maryland Cas. Co.*, 595 A.2d 469, 475 (Md. 1991); *see also Harrison v. Fireman's Fund Ins. Co.*, No. CIV.A. ELH-11-1258, 2011 WL 6939272, at *4 (D. Md. Dec. 29, 2011) (same). "Where the provisions of an insurance policy are unambiguous, the meaning of the terms is determined by the court as a matter of law." *Nautilus Ins. Co. v. REMAC Am., Inc.*, 956 F. Supp. 2d 674, 680 (D. Md. 2013). Extrinsic evidence is not considered when interpreting an insurance policy that is unambiguous on its face. *Id.* at 686; *see also ACE Am. Ins. Co. v. Ascend One Corp.*, 570 F. Supp. 2d 789, 794 (D. Md. 2008) ("Because the terms in this case are not ambiguous, the court does not look to extrinsic sources to interpret the terms."). If a contractual term is ambiguous, however, the court may consult "extrinsic sources" to ascertain the meaning. *Cole v. State Farm Mut. Ins. Co.*, 753 A.2d 533, 537 (Md. 2000). A policy term is considered ambiguous if the term is susceptible to more than one meaning to a reasonably prudent person. *Cole*, 753 A.2d at 537. When ambiguity remains after the court considers extrinsic evidence, the contract is construed against the insurer. *Nautilus Ins. Co. v. BSA Ltd. P'ship*, 602 F. Supp. 2d 641, 653 (D. Md. 2009); *see also Callaway*, 825 A.2d at 1005-06 (stating ambiguity

is construed against the drafter of the contract, which is usually the insurer) and *Clendenin Bros. v. U.S. Fire Ins. Co.*, 889 A.2d 387, 394 (Md. 2006) (same).

C.      **The Duty to Defend Under Maryland Law**

Maryland law recognizes that an insurer's duty to defend is broader than its duty to indemnify. *Litz v. State Farm Fire & Cas. Co.*, 695 A.2d 566, 569 (Md. 1997). An insurance company has a duty to defend against all claims that are potentially covered under the policy. *Walk v. Hartford Cas. Ins. Co.*, 852 A.2d 98, 106 (Md. 2004). The question of whether an insurance company has a duty to defend an insured is determined by a two-part inquiry:

> (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the underlying action potentially bring the claim within the policy's coverage?

*See ACE Am. Ins. Co. v. Ascend One Corp.,* 570 F. Supp. 2d 789, 794 (D. Md. 2008) (citing *St. Paul Fire & Mar. Ins. v. Pryseski ("Pryseski")*, 438 A.2d 282, 285 (Md. 1981)); *see also Cowan Sys., Inc. v. Harleysville Mut. Ins. Co.*, 457 F.3d 368, 372 (4th Cir. 2006). If any claims potentially come within the policy coverage, the insurer is obligated to defend all claims. *Utica Mut. Ins. Co. v. Miller*, 746 A.2d 935, 940 (Md. Ct. Spec. App. 2000). Any doubt as to whether there is a potentiality of coverage under a policy is resolved in favor of the insured. *Clendenin Bros.*, 889 A.2d at 394. An insurer relying on policy exclusions bears the burden of proving the exclusions apply. *See Ellicott City Cable, LLC v. Axis Ins. Co.,* 196 F. Supp. 3d 577, 584 (D. Md. 2016).

## D.    Interpreting the D&O Policy Between Plaintiffs and Argonaut[4]

D & O policies are obtained for the protection of individual directors and officers.  *Ochs v. Lipson* (*In re First Central Financial Corp.*), 238 B.R. 9, 13 (Bankr. E.D.N.Y. 1999).  They protect corporate officials from loss in the event of a claim made against them in their official capacity by stockholders or third parties.  James J. Hanks, Jr., *Maryland Corporation Law* § 6.21[m], at 226 (Supp. 1996-2) (citing *Continental Cas. Co. v. Board of Educ.*, 489 A.2d 536 (Md. 1985)); *see also* Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 131:31, at 131-36 (1997) (stating that D & O "coverage mirrors other professional liability insurance in that it is designed to protect corporate officials from loss in the event of a claim made against them in their official capacities").

The coverage provisions of the D&O Policy at issue here provide that the insurer shall pay "Loss of an Insured Person," including defense costs, "arising from a Claim first made during the Policy Period . . . for a Wrongful Act."  DE 28-1 at 16.[5]  A "Wrongful Act" is defined, in part, as "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by an Insured Person acting . . . on behalf of the Company."  *Id.* at 19.  The D&O Policy insures "Insured Person(s)" and "the Company" (in the event the Company must reimburse an Insured Person for loss).  *See id.* at 17.  "Insured Person(s)" include directors, trustees, officers,

---

[4]  The full title of the insurance contract – which includes three sections -- is "Private Company Directors & Officers Liability, Employment Practices Liability, Fiduciary Liability and Miscellaneous Professional Liability Insurance Policy."  DE 28-1 at 1.  The three sections are the Directors & Officers Liability Coverage Section (DE 28-1 at 16-26[4]); the Employment Practices Liability Coverage Section (*id.* at 27-34); and the Fiduciary Liability Coverage Section (*id.* at 35-45).  This Report and Recommendation refers to the Directors & Officers Liability Coverage Section as the D&O Policy.

[5]  The insurance contract is found in the record at DE 28-1 and DE 57-2.  As the copies provided to the Court by Plaintiffs at DE 28-1 and Defendant at DE 57-2 are identical, for simplicity the Court cites to Plaintiffs' version alone through the remainder of this Report and Recommendation.  The page numbers cited correspond to the page numbers assigned to the document through the Court's electronic filing system or the Bates Stamp numbers (which match those assigned by Court's system) and not the pre-printed page numbers on the various sections of the Policy.  Various terms throughout the contract are in bold print to signify that those terms are specifically defined elsewhere in the document.  *See generally* DE 28-1.  In quoting the text of the D&O Policy, the Court does not reproduce this bolded print.

managers, committee members or in-house counsel.  *Id.*  Argonaut issued the insurance to Plaintiff Lyric Health Care and its subsidiaries (which includes Plaintiff Atlantic Healthcare). *Id.* at 1, 6. An endorsement added Plaintiff Gratham Healthcare as an insured.  *Id.* at 58.  Nicholson is the 100% owner either directly or indirectly of all the Nicholson companies.  *See* DE 57-1 at ¶¶ 9, 13, 16.  Thus, there is no dispute that Nicholson is an "Insured Person" under the D&O Policy and the Nicholson companies—as Policyholders—constitute "the Company."

Although D&O insurance covers directors and officers for mismanagement, it does not necessarily cover every liability.  Exclusions are used to limit the coverage provided.  *See Philadelphia Indem. Ins. Co. v. Maryland Yacht Club, Inc.*, 742 A.2d 79, 91 (Md. Ct. Spec. App. 1999) (discussing D & O insurance policies generally).  The D&O Policy in this case contains various exclusions, several of which are raised by Argonaut as a basis for denying its duty to defend.  This Court considers each exclusion to determine whether it alone or in conjunction with the other exclusions precludes coverage of the claims in the Underlying Complaint.  "If there is a possibility, even a remote one, that the [Coombs estate's] claims could be covered by the policy, there is a duty to defend."  *Litz*, 695 A.2d at 572.

### 1.    Professional Services Exclusion

Argonaut first argues that the D&O Policy's professional services exclusion excludes all of the conduct alleged in the Underlying Complaint.  The exclusion provides that the insurer will not pay for losses arising out of the "rendering or failure to render professional services."  DE 28-1 at 16, 20-23.  Through an Endorsement, the D&O Policy defines "professional services" as follows:

**Professional Services** means any <u>health care, medical care, or treatment provided</u> <u>to others, or any other professional services</u>, including but not limited to: (i) medical, surgical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing or other professional health care; (ii) the use, prescription, furnishing or dispensing of medications, drugs, blood, blood products or medical, surgical, dental or psychiatric supplies, equipment or appliances in connection with (i) above; (iii) the furnishing of food or beverages in connection with (i) above; (iv) counseling or other social services in connection with (i) above; (v) the handling of, or the performance of post-mortem examinations on, human bodies; (vi) any services in (i) through (v) above in connection with any Clinical Trial, whether or not the trial adheres to a formal written protocol; (vii) improper billing or collection of fees for the services described in (i) through (vi) above; and (viii) failure to properly select, train, retain, evaluate, or supervise any provider of services described in (i) through (vi) above, including any actual or alleged defects in the discipline, evaluation, selection, de-selection, contracting, credentialing, privileging or peer review process.

*Id.* at 78 (emphasis added).

Argonaut makes two arguments as to why it has no duty to defend under this exclusion. First, it contends that the Underlying Complaint contains multiple allegations directly related to the provision of healthcare and medical services. DE 57 at 4-5. In support, Argonaut points to allegations about the Facility providing "inadequate nursing home services," inadequate nursing staff and failing to meet the patients' medical and personal needs. *Id.* at 4. It continues that all other allegations in the Underlying Complaint fall within the exclusion because the Coombs Lawsuit concerns the interaction between a professional healthcare facility and its residents. *Id.* at 4, 6. Argonaut thus contends that all allegations in the Underlying Complaint concern professional healthcare services as defined in Policy and, therefore, it has no duty to defend.

This first argument fails to persuade the Court that there is no potentiality of coverage. Some allegations in the Underlying Complaint, such as the intentional operation of the Facility with insufficient nursing staff, *see* DE 28-1 at ¶¶ 74-77, and the failure to meet the complex medical needs of high acuity patients, *id.* at ¶ 82, might fall within the scope of the exclusion. Other allegations, however, do not arise from providing or failing to provide medical or health

related professional services.  Indeed, most of the allegations in the Underlying Complaint do not relate to professional services of any kind.  They pertain to business decisions that Plaintiffs—and particularly Nicholson as sole officer and director—made in handling the Facility's affairs.  These include complaints about how Nicholson joined a Venture that included other companies he owned (*see, e.g., id.* at ¶ 57), structured the Venture for dishonest purposes (*see, e.g., id.* at ¶ 62), hid his ownership interests (*see, e.g., id.* at ¶ 66), paid higher than market rates to maximize profits at residents' expense (*see, e.g., id.* at ¶ 67) and diverted funds through problematic intra-company transfers and fees (*see, e.g., id.* at ¶ 89).  They also include claims that Nicholson and others exploited Ms. Coombs – a vulnerable adult—by taking her assets and property and using them for their own benefit instead of for her care.  These allegations do not relate to any kind of professional services, medical or otherwise.

Argonaut's second argument is that the Court should interpret the phrase "or any other professional services" broadly enough to include even services unrelated to medical treatment or healthcare. DE 57 at 5.  In support, Argonaut relies on the District of Maryland's interpretation of the term "professional services" in *Bolton Partners Investing Consulting Group, Inc. v. Travelers Indemnity Company of America*, 2007 WL 776675 (D. Md. Mar. 15, 2007)).  In *Bolton Partners*, a benefits and investment consulting firm (Bolton Partners) was sued for defamation after criticizing a benefits plan while rendering a report for one of its clients.  *Id.* at *2.  Bolton Partners then sued its commercial general liability insurer alleging a duty to defend against the defamation lawsuit.  *Id.*  The court granted summary judgment for the defendant-insurer, finding it had no duty to defend because the underlying claims fell within the policy's professional services exclusion. *Id.* at *9.  Unlike the definition of "professional services" in this case which references numerous examples of professional medical services, it was undisputed that the description of excluded

professional services in the policy at issue in *Bolton Partners* merely stated "Professional." *Id.* at

*1. Expounding on that description in the policy, the *Bolton Partners* court explained that

professional services "refers to any business activity conducted by the insured which involves

specialized knowledge, labor, or skill, and is predominantly mental or intellectual as opposed to

physical or manual in nature." *Id.* at *7 (quoting *Hurst–Rosche Engineers, Inc. v. Commercial

Union Ins. Co.,* 51 F.3d 1336, 1343 (7th Cir. 1995) (quoting *State Street Bank & Trust v. INA Ins.

Co.,* 567 N.E.2d 42, 47 (1991))). Argonaut encourages the Court to use this broad definition to

exclude all of the allegations of the Underlying Complaint because they concern services that were

"professional in nature." DE 57 at 6.

Argonaut's reliance on *Bolton Partners* is misplaced because the professional services

exclusion in that case differs significantly from the definition of "professional services" presently

before the Court. Contractual language cannot be construed in a vacuum. Language used in one

contract may carry a different meaning in another. This Court must interpret the language of the

D&O Policy in this case, which specifies that "professional services" means "healthcare, medical

care or medical treatment provided to others, or any other professional services[.]" DE 28-1 at 78.

The exclusion then specifies a list of illustrative examples, all of which relate to health care and

medical treatment. *Id.* Even the terms "billing" and "contracting"—which Argonaut highlights—

are specifically limited to that which is conducted to facilitate healthcare services. *See id.* This

Court reads the D&O Policy as a whole. Given the healthcare related nature of the examples

provided, the undersigned sees no need to expand the term "any other professional services" in a

way that pertains to every kind of professional service imaginable. As used in this Policy, the term

relates to professional healthcare and medical services. Moreover, even if the Court adopted the

broad view advocated by Defendant, that still would not cover all the allegations in the Underlying

Complaint since some allegations do not involve any kind of professional service, medical or otherwise.  The professional services exclusion by itself is not a basis for Argonaut to deny its duty to defend.

### 2.      Managed Care Activities Exclusion

Argonaut next argues it has no duty to defend because of the managed care activities exclusion.  The D&O Policy provides that Argonaut is not liable for losses arising from "performance of, rendering of or failure to perform or render any Managed Care Activity."  DE 28-1 at 79.  "Managed Care Activity" is defined in relevant part as:

> (i)      Utilization Review[6];
>
> (ii)     Claim Services[7];
> . . .
> (ix) advertising, marketing, selling or servicing health care … plans or any other Insurance Contract;
> . . .
> (xi)  services or activities performed in the administration or management of health care … plans;
>
> (xii)  the discipline, evaluation, selection, de-selection, contracting, credentialing, privileging or peer review of any provider of Professional Services; and
>
> (xiii)  any act, error, omission, misleading statement, misstatement, neglect, or breach of duty, committed or attempted by any Insured in the performance of, or failure to perform any Managed Care Activity as otherwise defined . . .

DE 28-1 at 77-78.

Argonaut contends that the entirety of the Underlying Complaint falls under the managed care activities exclusion because Plaintiffs' business "by its very nature" is managed care.  DE 57

---

[6] "Utilization Review means the process of evaluating the appropriateness, necessity or cost of Professional Services for purposes of determining whether payment or coverage for such Professional Services will be authorized or paid for under any health care plan."  DE 28-1 at 79.

[7] "Claims Services means the following services: the submission, handling, investigation adjudication, denial, payment or adjustment of claims for benefits or coverages under health care, behavioral health, prescription drug, dental, vision, disability or workers' compensation plans or other similar plans."  DE 28-1 at 75.

at 7.  This argument suffers from a similar defect as the argument relating to professional services in that it focuses on the description of Plaintiffs' business rather than the language of the D&O Policy and specific allegations in the Underlying Complaint.   Again, while some allegations arguably pertain to performing, rendering, or failing to render managed care activities as set forth in the exclusion, others do not.   Defendant points only to the allegations in Paragraphs 82-86 of the Underlying Complaint, which relate to Plaintiffs' understaffing of nurses, increasing of the overall acuity level of patients at the Facility without providing increased staff, and failure to provide adequate healthcare and meet residents' needs.  DE 57 at 7 (citing DE 28-1 at ¶¶ 82-86).  Defendant makes no argument whatsoever about how the remaining allegations about the Venture and Plaintiffs' taking Ms. Coombs's assets despite her being a vulnerable adult constitute managed care.  This exclusion sets forth specific language and Defendant makes no attempt to interpret that language or relate it to all the claims in the Coombs Lawsuit.  If the managed care activities exclusion applies to everything alleged in the Underlying Complaint simply because Plaintiffs operate a nursing home, then the D&O Policy provides no coverage at all.[8]  This exclusion is insufficient, by itself or in combination with the Professional Services Exclusion, to deny the duty to defend.

---

[8] At the Hearing on the parties' Motions for Summary Judgment held on July 30, 2020, Plaintiffs argued that Argonaut's expansive interpretation of the managed care exclusion is prohibited under Maryland law as it would render the D&O Policy illusory.  DE 72 at 25:7-26:8.  In response, the Court asked Defendant what the D&O Policy covers if the Court adopted its interpretation of the scope of the professional services and managed care exclusions.  *Id.* at 61:24-62:1.  Defendant answered that a non-resident visiting the Facility who slipped and fell would encounter a loss not excluded by the professional service or managed care exclusions.  *Id.* at 62:2-9.  Defendant continued that the D&O Policy "is written to protect the company . . .for basically claims arising out of third parties, not the people that are being cared for in the facility." *Id.* at 62:10-13.  This Court does not understand Defendant's example.  The D&O Policy at hand explicitly excludes claims "for actual or alleged bodily injury . . . of <u>any person</u>." DE 57-1 at 21 (emphasis added).  Further, nothing in the plain language of the D&O Policy indicates that it was the parties' intent to exclude claims regardless of their nature simply because they were asserted by residents of the Facility.

### 3.    Prior Acts Exclusion

Next, Argonaut argues there is no duty to defend because all the allegations in the Underlying Complaint fall within the Policy's prior acts exclusion, which generally excludes acts occurring before December 1, 2012, or acts interrelated with acts that occurred before that date. DE 57 at 8-10.  Argonaut contends that all the allegations relate to Ms. Coombs's arrival in the Facility or the Venture's formation, both of which occurred prior to the December 1, 2012. *See id.*  In support, Defendant relies on *Cristal USA Inc. v. XL Specialty Insurance Company*, ("*Cristal*") an unpublished case from the Maryland Court of Special Appeals. *Id.* (citing 2017 WL 727795 (Md. Ct. Spec. App. Feb. 24, 2017)).

The background facts of *Cristal* are as follows.  On May 15, 2007, Millennium Inorganic Chemicals ("Millennium"), a producer of titanium dioxide, was acquired by Cristal Inorganic Chemical, U.S. ("Parent Company").  *Cristal*, 2017 WL 727795, at *1.  Five years later, in 2012, Millennium was renamed Cristal USA and made a subsidiary of the Parent Company.  *Id.*  On May 16, 2007, the Parent Company purchased a D&O policy from Zurich American Insurance Company ("Zurich") and excess insurance from XL Specialty Insurance Company ("XL Specialty").  *Id.*  The Zurich policy was later renewed to cover the period from May 16, 2009 through May 16, 2010, a time when Cristal USA was operating as Millennium.  *Id.* at *3.  The Zurich policy included a prior acts exclusion that stated the insurer was not liable for loss "based upon, arising out of or attributable to Wrongful Acts, including Interrelated Wrongful Acts, committed, attempted or allegedly committed or attempted in whole or in part prior to May 15, 2007 for [Parent Company] and Its Subsidiaries."  *Id.* at *4, 14.   In 2010, Cristal USA [9] was sued

---

[9] The Court presumes that Cristal USA was sued as Millennium because Cristal USA's name was not changed until 2012.  *See* 2017 WL 727795, at *1, *3.  In discussing the underling litigation, however, the Maryland Court of Special Appeals does not specify this fact, simply stating that class action lawsuits were filed "against the Appellant."  *See id.* at *1, *4-5.

in two class action lawsuits initiated by purchasers of titanium dioxide alleging that Cristal USA conspired with other manufacturers "beginning as early as March 2002" to artificially raise prices in violation of antitrust law. *Id.* at *4-5. Although Zurich initially denied coverage, in part based on the prior acts exclusion, Zurich eventually withdrew the denial and paid to the full policy limits. *Id.* at *7. Cristal USA then turned to XL Specialty, who denied coverage for the claim and contended that any resulting loss arose out of Wrongful Acts or Interrelated Wrongful Acts that were committed or allegedly committed "in whole or in part prior to May 15, 2007." *Id.* at *8. Cristal USA sued XL Specialty in state court for a declaratory judgment on the duty to defend. The lower court found for the defendant-insurer. *Id.* at *9.

The specific issue before the appellate court in *Cristal* was the meaning of the phrase "prior to May 15, 2007 for [Parent Company] and Its Subsidiaries," given that Cristal USA did not become a subsidiary until 2012. *See id.* at *2, * 13-14. Cristal USA argued that the exclusion did not apply since prior to 2012 it operated as Millennium. *See id.* at *1, 13-14. Cristal USA also argued that the term "for" as used in the exclusion should be interpreted as "for the benefit of" the Parent Company and its subsidiaries. *Id.* The appellate court rejected these arguments. *Id.* at *18. Noting that no Maryland cases previously had construed prior act exclusions, the court relied on non-Maryland cases and insurance treatises to interpret the exclusion. *Id.* at *17-19. The court explained that

> Prior-act exclusions operate to bar coverage for loss in connection with <u>otherwise covered wrongful acts . . . which occurred prior to the date specified in the exclusions</u>. Prior-act exclusions frequently contain language extending the exclusions' reach to subsequent wrongful acts that are related to the excluded prior acts regardless of whether they occurred before or after the date specified in the exclusion.

*Id.* at *16 (quoting Steven Plitt and Jordan Ross Plitt, 2 *Practical Tools for Handling Insurance Cases* § 13:21 (2011 Ed., 2016 update) (emphasis added). Ultimately, the *Cristal* court held that

to interpret the prior act exclusion in the way Cristal USA proposed would render it meaningless and require the addition of words not found in the policy's plain language.  *Id.* at *18.  The court upheld summary judgment for the insurer.  *Id.*; *id.* at *24.

Although *Cristal* is unpublished and not binding,[10] this Court finds it instructive on how courts applying Maryland law might construe the prior act exclusion in this case.  The D&O Policy here states that the Insurer is not liable for Loss "based upon, arising out of, directly or indirectly resulting from, in consequence of, attributable to or in any way involving":

> 1. any act, omission, fact, circumstance, situation, transaction, or event <u>which occurred, or is alleged to have occurred, in whole or in part, prior to December 1, 2012, including any act</u>, omission, fact, circumstance, situation, transaction, and/or event <u>which constitutes a Wrongful Act</u>; or
>
> 2. <u>any other act</u>, omission, fact, circumstance, situation, transaction, or event, whenever occurring or allegedly occurring, <u>which together with an act, omission, fact, circumstance, situation, transaction, and/or event described in paragraph 1 above constitute Interrelated Wrongful Acts</u>.

DE 57-1 at 52 (emphasis added).  The Policy defines "Interrelated Wrongful Acts" to mean "<u>all Wrongful Acts</u> that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of logically or causally connected facts, circumstances, situations, events, transactions or causes."  *Id.* at 7 (emphasis added).

This Court reads the language of the exclusion and the comments in *Cristal* to mean that for the prior act exclusion to apply, there must be a <u>wrongful</u> act or circumstance prior to the cut-off date.  Further, for more than one act or circumstance to be "Interrelated Wrongful Acts," at least one of those wrongful acts must have occurred prior to the cutoff date.  With this interpretation in mind, the Court turns to the parties' arguments.  First, Argonaut contends that the

---

[10] Only a decision establishing relevant state law by a state's highest court is binding on the federal courts.  *See Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1874 (2018).  Maryland's highest court is the Maryland Court of Appeals; the Court of Special Appeals, which authored *Cristal*, is the state's intermediate appellate court.  *See* About the Maryland Court System, https://www.mdcourts.gov/courts/about (last visited Oct. 13, 2020).

misconduct alleged in the Underlying Complaint began when Ms. Coombs moved into the Facility on January 9, 2012. DE 57 at 8. Since January 9, 2012 predates the cutoff date, Argonaut says all of the wrongful acts alleged in the Coombs Lawsuit are excluded because they relate to Ms. Coombs's stay at the Facility. *Id.* This Court rejects that argument because the arrival of Ms. Coombs at the Facility on January 9, 2012, was not a wrongful act. As a result, it cannot be a prior act or circumstance excludable under the Policy. It also cannot be considered "Interrelated Wrongful Acts" with subsequent misconduct because again there is nothing wrongful about her admission to the facility. It is difficult to see how her admission to the Facility can constitute "Interrelated Wrongful Acts" (plural) if that act in itself is not wrongful.[11]

Next, Argonaut raises the beginning of the Venture as the relevant wrongful act or circumstance occurring prior to December 1, 2012. *Id.* at 10. This is a closer call. As discussed in the preceding sections, large portions of the Underlying Complaint relate to the Venture, specifically Nicholson's conduct in joining it (*see, e.g.,* DE 57-1. at ¶ 57), structuring it for dishonest purposes (*see, e.g., id.* at ¶ 62), hiding his ownership interests (*see, e.g., id.* at ¶ 66) and paying higher than market rates to other joint venture companies to maximize profits at residents' expense (*see, e.g., id.* at ¶ 67). If the Venture began prior to December 1, 2012, then all subsequent wrongful acts alleged in the lawsuit that share a common factual nexus with the Venture must be excluded under the Interrelated Wrongful Acts provision.

Two paragraphs in the Complaint mention the date the Venture started:

---

[11] At the Hearing on the parties' Motions for Summary Judgment held on July 30, 2020, Plaintiffs argued that Argonaut's interpretation of the exclusion was unreasonable and rendered the D&O Policy coverage illusory in a way contrary to Maryland law. *See* DE 72 at 26:5-28:5. They contended that under Argonaut's interpretation were they to buy an insurance policy today on a nursing home with existing residents and admit no new patients for a year, there would be no coverage under the policy for that year because the residents' admission dates predate the policy's cutoff date. *Id.* at 26:1-9. The plain language of the D&O Policy gives the Court no reason to believe the parties intended to exclude coverage for any act related to residents who were admitted to the Facility prior to December 1, 2012.

56.   At some time in 2012, TIMOTHY NICHOLSON, BRIAN REYNOLDS, JOHN W. DWYER, and ALAN J. ZUCCARI entered into an oral agreement to operate a group of management and consulting companies together as a partnership and/or joint venture partnership (the "Venture"). The entities operating as part of the Venture include, but are not limited to, Defendants, LYRIC HEALTH CARE HOLDINGS III, LLC f/k/a LYRIC HEALTH CARE HOLDINGS III, INC.; ADDIT, LLC; MILESTONE RETIREMENT COMMUNITIES, LLC; SLC PROFESSIONALS CHAI, LLC; SLC PROFESSIONALS MONARCH, LLC; and SLC PROFESSIONALS HOLDINGS, LLC. One of the trade names owned and used by the Venture at all material times was Compass Pointe Healthcare Systems.
. . .
65.   In or around 2012, TIMOTHY F. NICHOLSON, on behalf of his wholly owned entities--the Lyric Defendants, entered into an agreement with Atlantic Healthcare Center, Inc. and the Venture to utilize the Venture to operate, manage, consult with, and control the day-to-day operations of Atlantic Healthcare Center, among other facilities. The purpose of this agreement was to generate as much profits as possible from the operations of Atlantic Healthcare Center, at the expense of all the residents of the facility, including LILY COOMBS, and to the benefit of TIMOTHY F. NICHOLSON individually, Atlantic Healthcare Center, Inc., and the Venture.

*Id.* at ¶¶ 56, 65 (emphasis added).  These paragraphs indicate that Nicholson created and/or entered the Venture "in or around 2012" or "at some time in 2012".  That leaves open the potential – however slight—that the Venture was created after the exclusion date in the policy.  Nicholson could have joined the Venture after December 1, 2012, and still have done so "in or around 2012" or "at some time in 2012."  Any possibility of a claim, however remote, means there is a duty to defend.  *Litz*, 695 A.2d at 572.

The last act or event Argonaut raises is the averment in Paragraph 69 of the Underlying Complaint that Nicholson concealed his ownership in the Facility from regulatory authorities on May 25, 2012 in a license renewal application.  DE 57 at 10 (citing DE 57-1 at ¶ 69).  Allegedly, Nicholson did this because he wanted to hide his involvement in the Venture.  *See* DE 57-1 at ¶¶ 67-69.  There is no question that Paragraph 69 alleges a wrongful act that took place before the cut-off date in the prior acts exclusion.  Thus, a claim based on Paragraph 69 would be excluded under the Policy.  Further, under the interrelated wrongful acts provision, claims based on

subsequent wrongful acts that are interrelated with the wrongful act alleged in Paragraph 69 are also excluded.

This Court must therefore examine the Underlying Complaint closely to determine whether all of the other wrongful acts alleged therein share a common nexus of fact with the false statement made on May 25, 2012. Tellingly, while Paragraph 69 is incorporated in Counts I and II alleging claims for breach of fiduciary duties, *id.* at ¶¶ 113, 119, it is specifically not incorporated in Counts III and IV alleging exploitation of a vulnerable adult, *id.* at ¶¶ 127, 137.[12] *See Cristal*, 2017 WL 727795, at *22 (finding an interrelated wrongful acts exclusion applied where the underlying claims incorporated by reference allegations of wrongful acts that occurred both before and after the policy's prior acts cut-off date). Counts III and IV focus on Plaintiffs' use of Ms. Coombs's funds, and property for their own benefit despite knowing she lacked capacity to consent. *See, e.g., id.* at ¶¶ 129, 131-34, 138-40. This claim—that Plaintiffs exploited Ms. Coombs by using her property for their benefit instead of for her support—has naught to do with the false statement on May 25, 2012, providing professional medical service, or managed care. Because there is a possibility that this claim is covered by the Policy, a duty to defend exists.

### 4. Predatory Pricing or Unfair Business Practices Exclusion

In responding to Plaintiffs' Motion for Summary Judgment, Argonaut contends that it has no duty to defend based on the predatory pricing or unfair business practices exclusion. DE 34 at 11-16. That exclusion, found in Section Q, states that the insurer shall not be liable for any claim:

> Q.    based upon, arising out of or attributable to any actual or alleged (i) intentionally false or intentionally misleading advertising or (ii) price fixing, predatory pricing, restraint of trade, monopolization, anti-competitive conduct, unfair competition or unfair business or trade practice or any interference in another's contractual or business relationship.

---

[12] Indeed, Count III takes pains to specify that "[f]or the purposes of this count and only this count, it is not alleged that Defendants are an entity that established, controlled, conducted, managed or operated the Facility." DE 57-1 at ¶ 128.

DE 28-1 at 20-23.  As Plaintiffs reply, however, this exclusion was removed from the D&O Policy

through an Endorsement.  DE 42 at 7.  Indeed, the Antitrust Sub-Limit Endorsement to the D&O

Policy expressly states that "Section Q. of the Directors & Officers Liability Coverage Section is

deleted."  DE 28-1 at 72.  Argonaut acknowledged the deletion in its Reply in support of its

Amended Motion for Summary Judgment and withdrew its arguments based on this exclusion.

DE 63 at 2-4.  Thus, Argonaut cannot avoid its duty to defend on this basis.

### 5.  Payments or Gratuities to Officers Exclusion ("Exclusion K")

Argonaut also argues in response to Plaintiffs' Motion for Summary Judgment that it has

no duty to defend because of Exclusion K, which pertains to payments or gratuities made to

officers and agents.  DE 34 at 11- 16.  That provision excludes liability:

K. based upon, arising out of or attributable to any actual or alleged:

1. Payments, commissions, gratuities, benefits or favors to or for the benefit of any full or part time domestic or foreign government official, agent, representative, employee, or military personnel, including any family member of, or any entity affiliated with, any of the foregoing;

2. Payments, commissions, gratuities, benefits or favors to or for the benefit of any full or part time officers, directors, agents, partners, representatives, principal shareholders, owners or employees of any customer or potential customer of any Insured, including any family member of, or any entity affiliated with, any of the foregoing; or

3. Political contributions, whether domestic or foreign.

DE 28-1 at 22-23.  Merely quoting back the text of subsection 2, Argonaut contends, without

argument or explanation, that the Underlying Complaint alleges payments and gratuities as set

forth in Section K.2.  Defendant fails to specify which statements in the Underlying Complaint

describe conduct falling within Section K.2, so the Court is left to speculate, which it declines to

do.  In construing Exclusion K, this Court gives its words their usual, ordinary, and accepted

meaning, and construes the provision as a whole to determine the parties' intent. Exclusion K.1 excludes losses attributable to payments or gratuities made to government officials and their family members. Exclusion K.2 excludes losses attributable to payments or gratuities made to owners, officers or agents of customers or potential customers and their family members. Exclusion K.3 excludes losses attributable to political contributions. The undersigned sees no allegations relating to payments or gratuities to customers in the Underlying Complaint. Allegations that members of the Venture paid each other higher than market rates to make a profit, *e.g. id.* at ¶ 67, do not concern Plaintiffs' interaction with customers or potential customers. As none of the allegations in the Underlying Complaint fall within Exclusion K, it does not defeat the duty to defend.

### 6.    Bodily Injury and Specific Damages Exclusions

Next Argonaut raises the D&O Policy's bodily injury exclusion. The Policy provides that Argonaut will not be liable for loss "for actual or alleged bodily injury … or death." DE 28-1 at 21. Although the Underlying Complaint alleges that Plaintiffs' conduct caused or contributed to Ms. Coombs's "physical" injuries, it says she suffered "monetary injuries" as well. DE 57-1 at ¶¶ 90, 125, 143. Thus, this exclusion does not prevent a duty to defend.

Argonaut also raises exclusions contained in the Policy's definition of Loss. As defined in the D&O Policy, "Loss" means:

> the total amount which the Insured(s) become legally obligated to pay on account of Claims made against them solely for Wrongful Acts for which coverage applies, including, but not limited to: <u>damages, judgments and settlements; any award of pre-judgment and post-judgment interest on covered judgments and settlements; claimants' counsel fees awarded pursuant to a covered judgment or included as part of a covered settlement; and Defense Costs</u>. Loss shall also include <u>punitive or exemplary damages</u> or the amount of multiplied damages that is not in excess of the damage award so multiplied awarded pursuant to a covered judgment or included as part of a covered settlement.

DE 28-1 at 18 (emphasis added).  Loss does not include, however, "disgorgement or restitution, whether paid, returned or reimbursed pursuant to a settlement or in satisfaction of a judgment." *Id.*  In addition, the question of punitive damages shall be governed by the law of the applicable jurisdiction.  *Id*.  While these exclusions may eliminate coverage for some of the damages alleged in the Underlying Complaint, they do not eliminate coverage for all of the damages alleged.  The Underlying Complaint seeks consequential damages, attorneys' fees, and prejudgment interest, DE 57-1 at ¶¶ 27, 29-30, 31-32, 34, all of which fall within the Policy's definition of a covered "Loss."  *See* DE 28-1 at 18.  It also seeks restitution and disgorgement, which are not covered by the Policy.   Under the potentiality rule, this Court must look to whether a potential remains that some claims alleged in the Underlying Complaint are covered by the D&O Policy.  In this case, the answer is yes.  As such, a duty to defend remains.[13]

## CONCLUSION

Argonaut fails to persuade this Court that none of the claims raised in the Underlying Complaint are potentially covered by the D&O Policy.  This Court disagrees with Argonaut that the Coombs estate seeks redress only for actions that can be characterized as "professional services" or "managed care activities."   While claims about nursing understaffing and failure to meet patients' medical relate to providing or failing to provide professional services and managed care, the other claims in the Underlying Complaint are not covered by these exclusions.  While

---

[13] The parties also proffer arguments regarding the exclusion of coverage for punitive damages.  *See, e.g.,* DE 27 at 22-23; DE 57 at 10-12.  Generally, Defendant argues that because the conduct that would give rise to punitive damages occurred in Florida, Florida law—which prohibits the insurability of punitive damages—should apply.  DE 57 at 10-12.  On this basis, Defendant argues punitive damages are not covered by the D&O Policy.  *Id*. at 12.  Plaintiffs respond that Maryland law allows the insurability of punitive damages, and if there is any ambiguity about what law to apply, that ambiguity must be construed in their favor.  DE 61 at 16.  The Court need not decide which law applies because the Underlying Complaint does not seek punitive damages.  *See generally* DE 57-1.  Rather, it reserves the right to "to amend this Complaint to add a demand for punitive damages at the appropriate time." *E.g., id.* at 34.  Also, even if the D&O Policy excluded punitive damages, the fact remains that some damages are not covered such that a duty to defend exist.

claims based on Plaintiffs' alleged involvement in the Venture and false statements to regulatory authorities may be covered by the prior acts and interrelated wrongful acts exclusions, those provisions do not cover the lawsuit's claim that Plaintiffs exploited Ms. Coombs—a vulnerable adult—by taking her money and assets and using them for themselves.  The predatory pricing or unfair business practices exclusion was deleted from the D&O Policy, and the plain language of Exclusion K provides no basis on which Defendant can deny a defense.  Plaintiffs' requests for monetary damages, including consequential damages, attorneys' fees and prejudgment interest, fall within the Policy's definition of a covered "Loss." The Underlying Complaint, therefore, alleges facts that potentially bring the Coombs Lawsuit within the D&O Policy coverage, even if only partially or remotely so, and they successfully trigger the insurer's duty to defend.  Stated differently, Argonaut fails to meet its burden of persuasion to show how <u>all</u> of the claims brought by the Coombs estate fall <u>entirely</u> within the exclusionary provisions.[14]

**ACCORDINGLY**, this Court recommends to the District Court that the Plaintiffs' Motion for Summary Judgment (DE 27) be **GRANTED** and that the Defendant's Amended Motion for Summary Judgment (DE 57) be **DENIED**.  This Court recommends further that Final Judgment be rendered in the Plaintiffs' favor to the extent it seeks such a declaration regarding the insurer's duty to defend.  Regarding the duty to indemnify, that question of coverage does not become ripe for adjudication until there is a factual determination that the insured is liable on the underlying claim.  *See Nautilus Ins. Co.* 602 F. Supp. 2d at, 657; *see also Walk v. Hartford Cas. Ins. Co.*, 852 A.2d 98, 106 (Md. 2004) (The "duty to defend depends only upon the facts as alleged, and the duty to indemnify depends upon liability.").  Therefore, a question as to the duty to indemnify

---

[14] Because the Court did not find any of the provisions of the D&O Policy ambiguous, it did not consult extrinsic evidence, including the Affidavit of Timothy Nicholson submitted by Plaintiffs at DE 28-3.  *See Nautilus Ins. Co.*, 956 F. Supp. 2d at 686; *ACE Am. Ins. Co.,* 570 F. Supp. 2d at 794.

must await final resolution (via final judgment, settlement, or the like) of the underlying lawsuit brought by the Coombs estate.

The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Robin L. Rosenberg, the United States District Judge assigned to this case.  Failure to file timely objections shall bar the parties from a de novo determination by the District Court of the issues covered in this Report and Recommendation and bar the parties from attacking on appeal the factual findings contained herein.  *LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th Cir. 1988), *cert. denied*, 488 U.S. 958 (1988).  Conversely if a party does not intend to object to this Report and Recommendation, then that party shall file a Notice of such within five (5) days of the date of this Report and Recommendation.

**DONE AND SUBMITTED** in Chambers at Fort Pierce, Florida, this 15th day of October, 2020.

_____
SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE